AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☒ Original   ☐ Duplicate Original

FILED
CLERK, U.S. DISTRICT COURT
12/21/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___hc___ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | Case No.   2:21-mj-05706-Duty |
| KIMBERLY ANN MILETTA, | |
| Defendant | |

LODGED
CLERK, U.S. DISTRICT COURT
12/21/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___jb___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of June 23, 2017 in the county of Santa Barbara in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

  *Please see attached affidavit.*

☒ Continued on the attached sheet.

*Benjamin P. Platts*
*Complainant's signature*

Benjamin P. Platts, Special Agent FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   December 21, 2021

*Judge's signature*

City and state:   Los Angeles, California     Hon. Gail J. Standish, U.S. Magistrate Judge
*Printed name and title*

AUSA:  Carolyn Small (x2041)

**AFFIDAVIT**

I, Benjamin P. Platts, being duly sworn, declare and state as follows:

**PURPOSE OF AFFIDAVIT**

1. This affidavit is made in support of a criminal complaint and arrest warrant against KIMBERLY ANN MILETTA ("MILETTA") for a violation of Title 18, United States Code, Section 1343 (Wire Fraud).

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

**BACKGROUND OF SPECIAL AGENT PLATTS**

3. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since August 2016.  I am currently assigned to the Los Angeles Division's Santa Maria Resident Agency, where I specialize in the investigation of complex financial crimes and cyber-based offenses.  As an FBI Special Agent, I have participated in various investigations involving wire fraud, money laundering, bank fraud, computer intrusions, and public corruption.  In

1

addition, I have received specialized training from the FBI and other institutions regarding financial crimes and computer-related investigations. Prior to joining the FBI, I worked as a police officer in the State of Colorado for approximately five years.

## SUMMARY OF PROBABLE CAUSE

4.  MILETTA was the president of Phoenix Books, a small independent book and audio publishing company now owned by J.O. For years, MILETTA had unfettered access to Phoenix Books' and J.O.'s financial accounts, and she ran Phoenix Books with virtually no oversight.

5.  Financial records, information from J.O., and vendor invoices and purchase records show that between 2014 and 2018, MILETTA embezzled funds from Phoenix Books and J.O. by (1) charging unauthorized personal expenses to a business credit card, and (2) causing Phoenix Books to pay rent for MILETTA's boyfriend, B.C., who MILETTA had hired to work at Phoenix Books. After J.O. discovered this embezzlement and terminated MILETTA's employment, an audit showed that highly valuable intellectual property and other business records and documents were missing from the company's inventory. Many of the missing records were discovered in MILETTA's residence and on her digital devices, which were searched pursuant to federal search warrants.

6.  Additionally, in October 2013, MILETTA wired money out of J.O.'s personal checking account without J.O.'s authorization. Specifically, MILETTA wired nearly a million dollars out of J.O.'s personal checking account to purchase a

house in the name of a company that MILETTA had formed one month before the purchase and wired nearly $50,000 out of the same account to purchase a car that she registered in her own name and later sold for a profit of approximately $30,000.

## STATEMENT OF PROBABLE CAUSE

7. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A. Background**

8. I know from witness interviews that Phoenix Books is a small independent book and audio publisher that acquires rights to literary and other works and then sells those works as audiobooks or in other formats. Phoenix Books maintains an extensive inventory of digital and written literature, audiobooks, artwork, and film.

9. The company is presently wholly owned by J.O., who inherited the business from her husband, D.O., after D.O. died in June 2013. Phoenix Books used to maintain a physical location in Beverly Hills, but it transitioned to remote operations in 2013.

10. MILETTA was employed at Phoenix Books from approximately 2008 until approximately July 2018. She started as an executive assistant and was eventually promoted to president. She played an integral role in the company and had many responsibilities, including overseeing the company's finances and inventory, handling human resources and legal matters, and booking business travel for employees.

11. After D.O. died, MILETTA had total control of, and unfettered access to, the finances at Phoenix Books. According to J.O., J.O. was not involved in managing the company and had no knowledge of its day-to-day operations or finances.

12. Following D.O.'s death, J.O. relied heavily on MILETTA not only to run Phoenix Books, but also to handle J.O.'s personal affairs, including paying J.O.'s bills. To that end, J.O. gave MILETTA access to various of J.O.'s accounts, including J.O.'s personal checking account. J.O. placed a great deal of trust in MILETTA and viewed her like a sister.

13. Tensions began to mount between J.O. and MILETTA in 2017 and 2018 when MILETTA resisted J.O.'s efforts to learn about Phoenix Books' finances in anticipation of potentially selling the company. J.O. became increasingly concerned about MILETTA's refusal to provide J.O. access to requested records and accounts and ultimately fired her in July 2018.

14. J.O.'s counsel hired a private forensic accounting firm to conduct a full audit of the company's finances during MILETTA's employment. The auditors determined that between 2015 and 2018, MILETTA caused significant losses to Phoenix Books and J.O. by causing the company and J.O. to pay MILETTA's personal expenses and the personal expenses of MILETTA's boyfriend, B.C.

   **B.   MILETTA's Embezzlement from Phoenix Books and J.O.**

15. Financial records and records from vendors show that MILETTA embezzled from Phoenix Books and J.O. in at least two ways. First, MILETTA charged personal expenses to an American Express credit card that was in the company's name and was to be

used only for business expenses.  As discussed below, although the credit card at issue was in Phoenix Books' name, the balance of the credit card was always paid from J.O.'s personal checking account.  Accordingly, MILETTA's misuse of the corporate American Express credit card resulted in theft from J.O., rather than Phoenix Books.  Second, for over a year, MILETTA caused the company to pay rent for MILETTA's boyfriend, who MILETTA had hired to work at Phoenix Books.

      1.    <u>MILETTA's Use of the Business American Express Credit Card to Charge at Least Approximately $250,894 for Unauthorized Personal Purchases</u>

16. J.O. opened a corporate credit card account from American Express under the name Phoenix Books (the "AMEX Account").  American Express records show that in approximately April 2014, MILETTA became an authorized user on the AMEX Account, and a credit card linked to the AMEX Account was issued in MILETTA's name (the "Business AMEX Card").  According to J.O., J.O. authorized MILETTA to use the Business AMEX Card for Phoenix Books' business expenses, like gasoline, business lunches, and Amazon purchases.  J.O. did not authorize MILETTA to charge any of MILETTA's personal expenses to the Business AMEX Card.

17. J.O. provided MILETTA online access to the AMEX Account and authorized her to pay the Business AMEX Card balance each month.  J.O. did not check the AMEX Account or review the statements and was under the mistaken impression that MILETTA paid the monthly balance of the Business AMEX Card from Phoenix Books' checking account.  In fact, however, MILETTA paid the

balance of the Business AMEX Card solely from J.O.'s personal checking account, even though J.O. had given MILETTA access to her personal checking account for the purpose of paying J.O.'s personal expenses, not Phoenix Books' business expenses.

18. M.M. was Phoenix Books' in-house bookkeeper during the relevant time. M.M. has confirmed that her accounting of company expenses would have included only expenses that were paid for from the company's checking account and would not have included any expenses that were paid for from other sources. Accordingly, because MILETTA paid the Business AMEX Card from J.O.'s personal checking account, rather than Phoenix Books' checking account, M.M. would not have reviewed, and does not recall reviewing or otherwise accounting for, the American Express charges.

19. American Express statements and vendor invoices supporting charges made to the Business AMEX Card show that between 2014 and 2018, MILETTA frequently used the Business AMEX Card for expenses that appear to have been of a personal, non-business-related nature, such as designer clothing, purses, and sunglasses; airline tickets for MILETTA's sister[1]; veterinary expenses; pet supplies and accessories; spa treatments; and mattresses and rugs. In total, MILETTA charged at least

---

[1] There is no evidence MILETTA's sister provided any business services to Phoenix Books. According to J.O., MILETTA's sister had no connection to Phoenix Books, there would have been no business reason for Phoenix Books to pay for travel for MILETTA's sister, and J.O. never authorized MILETTA to purchase flights for MILETTA's sister.

approximately $250,894 of personal expenses to the Business AMEX Card.

20. Below are three examples of credit-card transactions that constitute executions of MILETTA's fraudulent scheme. An American Express representative has confirmed that interstate electronic communications were involved in each of the below transactions because the transactions were processed through servers in Greensboro, North Carolina.

> a. *A charge of approximately $3,973 at Advanced Veterinary Specialists in Santa Barbara on or about June 23, 2017*

21. Records from American Express show that on or about June 23, 2017, MILETTA charged approximately $3,973 to the Business AMEX Card at "Advanced Veterinary Sp" in Santa Barbara, California. Invoices from Advanced Veterinary Specialists show that the payment was for various veterinary services for a cat named Selah. MILETTA's name and address are listed on the invoices.

22. On or about October 10, 2019, I, along with other FBI agents, executed federal search warrants at two properties associated with MILETTA.[2] During the execution of those warrants, we saw numerous cats on the property where MILETTA appeared to be residing.

23. According to J.O., J.O. did not have any cats (or any other pets) in June 2017, and she did not authorize MILETTA to

---

[2] The affidavits supporting the search warrants remain under seal.

7

use the Business AMEX Card for this or any other veterinary expenses.

24. I know from reviewing American Express records and vendor invoices that the June 23, 2017 veterinary charge was one of several veterinary expenses that MILETTA charged to the Business AMEX Card between 2014 and 2018.  The total veterinary expenses MILETTA charged to the credit card was approximately $28,488.

> b. *A charge of approximately $2,320 at Thibiant Beverly Hills Medical Spa on or about October 10, 2017*

25. Records from American Express show that on or about October 10, 2017, MILETTA charged approximately $2,320 to the Business AMEX Card at Thibiant Beverly Hills, a medical spa in Beverly Hills, California.

26. Treatment and payment records from Thibiant show that the payment was for a face, neck, and chest rejuvenation treatment and various beauty serums and face products.  MILETTA is listed as the patient for the treatment provided, and she signed a consent form.

27. According to J.O., J.O. did not authorize MILETTA to pay for treatments for herself at Thibiant with the Business AMEX Card.

28. American Express and Thibiant records show that MILETTA visited Thibiant several times in 2017 and charged a total of approximately $6,107 to the Business AMEX Card during her visits there.

8

> c. A charge of approximately $5,419 at The Sleep Shoppe in Ventura on or about December 7, 2017

29. Records from American Express show that on or about December 7, 2017, MILETTA charged approximately $5,419 to the Business AMEX Card at The Sleep Shoppe in Ventura, California. The invoice from The Sleep Shoppe shows that the payment was for a mattress. The invoice states that the mattress was sold to MILETTA and was to be shipped to her at an apartment on Statham Boulevard in Oxnard, California. I know that this shipment address is the address where MILETTA's boyfriend was residing based on records from the company that managed the apartment and from an email MILETTA sent to the Phoenix Books' bookkeeper, M.M., on February 1, 2016 requesting that M.M. change the address on B.C.'s W-2 to the Statham Boulevard address.

30. I am aware based on surveillance and text messages from MILETTA's phone seized pursuant to the federal search warrants that MILETTA's house burned down during the Thomas Fire in December 2017. MILETTA purchased this mattress shortly after her house burned down. According to J.O., J.O. offered to let MILETTA stay with her and gave MILETTA $13,000 cash to get another place to live and help with buying replacement necessities. J.O. did not, however, authorize MILETTA to use the Business AMEX Card to purchase this mattress.

  2. Rent Payments from Phoenix Books' Checking Account Totaling Approximately $28,782

31. In addition to charging unauthorized personal expenses to the Business AMEX Card, MILETTA also embezzled funds by

9

causing Phoenix Books to pay rent for MILETTA's boyfriend, B.C., who MILETTA had hired as a Phoenix Books employee.

32. While employed at Phoenix Books, MILETTA had access to the company's checking account, which was a Bank of America account ending in -1678 (the "Phoenix Books Checking Account"). Bank records show that MILETTA was added as a signatory to the account in 2009. The other signatories were J.O., who did not use the account; J.O.'s late husband, D.O.; and G.P., who was the vice president of sales from 2008 to 2010. According to J.O., MILETTA was authorized to use the Phoenix Books Checking Account only to pay for the company's expenses.

33. According to witnesses, MILETTA hired B.C. in approximately 2011 to manage Phoenix Books' storage units. B.C. was primarily responsible for fulfilling online purchase orders, but he also performed other tasks, such as running errands for Phoenix Books and assisting with IT issues. Skype messages seized pursuant to the federal search warrants from MILETTA's laptop and text messages on her phone show that B.C. and MILETTA were in a romantic relationship. Escrow records I have reviewed show that when B.C. bought a house in February 2018, MILETTA contributed $28,000 and sent a gift letter in which she described B.C. as her domestic partner.

34. Although J.O. spoke with MILETTA frequently while MILETTA was employed at Phoenix Books and believed she and MILETTA were extremely close, MILETTA never told J.O. that she and B.C. were dating. Other Phoenix Books employees I

interviewed also were not aware that MILETTA and B.C. were in a relationship.

35. Records from the Phoenix Books Checking Account show that starting on January 31, 2017, and ending on January 31, 2018, Phoenix Books made monthly payments in the amount of approximately $2,214 to "Locali Management," resulting in total payments of approximately $28,782. According to a Bank of America representative, the January 31, 2017, and January 31, 2018, debits from the Phoenix Books Checking Account were processed through servers in Richardson, Texas.

36. Evidence shows that the LoCali Management payments were for B.C.'s rent. Specifically, MILETTA's old laptop, searched pursuant to the federal warrants, contained an unsigned lease renewal agreement between LoCali Management Group, LLC and B.C. in which LoCali agreed to rent to B.C. Apartment 106 on Statham Boulevard in Oxnard, California (the "Statham Apartment") for $2,150 per month beginning on August 1, 2016. According to the lease renewal agreement, the Statham Apartment was to be used "for residential and light industrial use only." A representative from LoCali described the apartment as a "live/work art loft." Documents from Phoenix Books show that on approximately February 1, 2016, MILETTA emailed Phoenix Books' bookkeeper to request that the address on B.C.'s W-2 be changed to the Statham Apartment address.

37. LoCali's payment records show that B.C. was charged rent for the Statham Apartment in the amount of $2,150 per month from January 1, 2017, to March 2018. There was a $64

11

transaction fee associated with the payments, which is why Phoenix Books' bank records show a charge of $2,214. Between January 2017 and September 2017, these payments were debited automatically from a card ending in 6049; starting in October 2017, payments were debited automatically from a card ending in 6666.

38. Bank statements from the Phoenix Books Checking Account mirror the LoCali records in that they show the rent payments were made from the account's debit card ending in 6049 from January to September 2017 and were made from the account's debit card ending in 6666 from October 2017 to January 2018. Debit card information from Bank of America shows that MILETTA was the authorized user on both debit cards; no other users are listed. I know from reviewing records from MILETTA's bank accounts that MILETTA made B.C.'s final rent payment in March 2018 from her personal bank account.

39. Phoenix Books' accounting records show that the LoCali management payments were classified on the company's books as "Rent – Warehouse." According to the bookkeeper, M.M., she received information about how to classify expenses exclusively from MILETTA. M.M. has stated she was not aware that Phoenix Books was paying B.C.'s rent in 2017. She believed any lease payments were for warehouse leases. Phoenix Books' records show that Phoenix Books did have warehouse leases, but those leases were in Phoenix Books' name; they were not in the name of any individual employee.

**C.  Discovery of Phoenix Books' Property and Records at MILETTA's Residence and On Her Digital Devices**

40.  After J.O. discovered MILETTA's embezzlement and terminated MILETTA's employment, an internal audit showed that highly valuable intellectual property and other business records and documents were missing from the company's inventory.  The missing inventory included various original contracts and contract files, original videotapes and film reels, accounts-payable files, and company computers and hard drives containing valuable digital artwork and internal and external communications.

41.  According to J.O.'s attorney, his firm sent letters to MILETTA and an attorney who represented MILETTA for a period of time requesting return of Phoenix Books' property and records believed to be in MILETTA's possession.  However, the requested property was never returned.

42.  As noted above, on or about October 10, 2019, I, along with other FBI agents, executed federal search warrants at two properties associated with MILETTA.  We also searched MILETTA's iCloud account pursuant to a federal warrant.  During those searches, we seized voluminous documents, records, and other property that appeared to belong to Phoenix Books.

**D.  MILETTA's Unauthorized Wire Transfers from J.O.'s Personal Checking Account**

43.  In addition to the embezzlement described above, MILETTA also wired money out of J.O.'s personal checking account without authorization on two occasions.  Specifically, in October 2013, MILETTA (1) wired approximately $973,213 from

13

J.O.'s account to purchase a house; and (2) wired approximately $47,360 from J.O.'s account to purchase a car.

 1. Unauthorized Wire Transfer of Approximately $973,213 to Purchase a House on Breaker Drive in Ventura

44. J.O.'s main personal checking account is a Bank of America checking account ending in -5004 ("J.O.'s Checking Account"). On July 22, 2013, a month after D.O. died, J.O. gave MILETTA a durable power of attorney over J.O.'s Checking Account and made MILETTA a signatory on the account. J.O. said she gave MILETTA access to the account in case of emergency and so MILETTA could pay J.O.'s bills. According to J.O., no one other than MILETTA knew the passwords or was authorized to access J.O.'s Checking Account. By signing the power of attorney and signature card addendum, which was notarized, MILETTA agreed, among other things, that she would act in good faith pursuant to the authority given to her as attorney-in-fact.

45. On or about October 29, 2013, approximately three months after J.O. added MILETTA as a signatory on J.O.'s Checking Account, MILETTA purchased a house on Breaker Drive in Ventura (the "Breaker Property") for approximately $1,000,000 via an entity called Worth It, LLC. California Secretary of State records and Worth It's operating agreement show that MILETTA formed Worth It a month before the house purchase.

46. Funds for the purchase of the Breaker Property came from two sources: a wire transfer in the amount of approximately $30,000, and a wire transfer in the amount of approximately $973,213. The $973,213 wire transfer came from J.O.'s Checking

14

Account.  Bank records list the originator's name for the wire transfer as "Kimberly Miletta."  In the column that lists instructions from the originator to the beneficiary, there's a note that states, "Investment income."  According to J.O., any investment income in J.O.'s Checking Account belonged to J.O.; it did not belong to MILETTA and MILETTA was not authorized to use it for any of MILETTA's personal expenditures.

47. Records from Pacific Coast Title show that in order to finalize the purchase of the Breaker Property, MILETTA provided a signed Third Party Deposit Instructions form dated October 28, 2013 (the "Deposit Instruction Form").  The Deposit Instruction Form stated in relevant part as follows: "I/we hand you herewith a wire in the amount of $950,532.  You are instructed to deposit this check in the above numbered escrow for the benefit of WORTH IT, LLC, a party to this escrow."  The form purported to have been signed by J.O.

48. J.O. reviewed a copy of the Deposit Instruction Form and advised that the signature on the form was not hers.  J.O. could not definitively identify the handwriting as belonging to MILETTA, but she recalled that on several occasions during her employment, MILETTA asked J.O. to demonstrate J.O.'s signature because MILETTA wanted to make her signature look more attractive, like J.O.'s signature.

49. J.O. also said that in or around October 2013, MILETTA called her and said something along the lines of, "If Bank of America calls about a $1,000,000 wire transfer, I did it."  MILETTA then hung up.  J.O. later questioned MILETTA about the

15

wire transfer and told MILETTA that J.O. did not agree to MILETTA taking $1,000,000 from J.O.'s account.  When J.O. asked MILETTA what the money was used for, MILETTA told J.O. she purchased a house.

50. J.O. explained that although she did not authorize MILETTA's nearly $1,000,000 wire transfer, she did not take any action at that time because MILETTA had previously threatened to quit Phoenix Books and J.O. believed she could not run the company or handle litigation related to her husband's estate without MILETTA's assistance.  J.O. felt she was in a difficult position because she was dealing with many issues in the wake of her husband's death and MILETTA had made herself an indispensable part of J.O.'s life.

51. MILETTA appears to have resided at the Breaker Property from approximately July 2014 until approximately December 2017, when the house was destroyed by the Thomas Fire.  I believe based on surveillance and executing search warrants that MILETTA now lives with B.C.  The statements for MILETTA's First Entertainment Credit Union bank account list the Breaker Property as her mailing address for the period of July 1, 2014 to April 30, 2019.  Property records list Worth It, LLC, MILETTA's company, as the current owner of the Breaker Property.

    2.   <u>Unauthorized Wire Transfer of Approximately $47,360 to Purchase a Car</u>

52. In addition to purchasing a house with J.O.'s money without authorization, MILETTA also purchased a car.

16

53. On October 16, 2013, just a couple weeks before the house purchase, approximately $47,360 was wired from J.O.'s Checking Account to City National Bank for the benefit of Alant Corporation, which does business as an Audi dealership.  J.O. said she did not authorize this wire transfer.  Bank records list the originator's name for the wire transfer as "Kimberly Ann Miletta."

54. Records from Alant Corporation show that around 10 days before the wire transfer, MILETTA completed paperwork to purchase a used 2010 Porsche Cayenne for a cash sale price of approximately $47,360.  In connection with the purchase, MILETTA provided a California driver's license photo identification and her social security number.  DMV records show that the photo identification MILETTA provided in connection with the purchase of the Porsche matches official government identification records for MILETTA.  DMV records further show that the car was registered to MILETTA as of approximately October 21, 2013.

55. I know based on my review of records from the DMV and Carmax that MILETTA sold the Porsche to Carmax on or about August 15, 2014, for approximately $30,000.  MILETTA's First Entertainment Credit Union account ending in 9126-80 was credited with a $30,000 check from Carmax on or about August 26, 2014.

## CONCLUSION

56. For all of the reasons described above, there is probable cause to believe that MILETTA engaged in a scheme to defraud and to obtain money and property from J.O. and Phoenix

17

Books, and that, in furtherance of this scheme, on or about June 23, 2017, within the Central District of California, MILETTA caused the electronic transmission of approximately $3,973.77 to Advanced Veterinary Specialists by means of an interstate wire to purchase veterinary services without authorization, in violation of Title 18, United States Code, Section 1343 (Wire Fraud).

/S/
Benjamin P. Platts, Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 21 day of December, 2021.

THE HONORABLE GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE